SAM S. PUATHASNANON, Cal. Bar No. 198430
Email: puathasnanons@sec.gov
ANN C. KIM, Cal. Bar No. 212438
Email: kimac@sec.gov
WENDY E. PEARSON, Cal. Bar No. 211099
Email: pearsonw@sec.gov

Attorneys for Plaintiff
Securities and Exchange Commission
Michele Wein Layne, Regional Director
John W. Berry, Regional Trial Counsel
5670 Wilshire Boulevard, 11th Floor
Los Angeles, California 90036
Telephone:    (323) 965-3998
Facsimile:    (323) 965-3815

## UNITED STATES DISTRICT COURT

## SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION,<br><br>                    Plaintiff,<br><br>        vs.<br><br>JING WANG and GARY YIN,<br><br>                    Defendants. | Case No.  **'13 CV 2270 L      WVG**<br><br>**COMPLAINT** |

Plaintiff Securities and Exchange Commission ("SEC") alleges as follows:

## SUMMARY

1.     This action concerns an insider trading scheme by Defendants Jing Wang, a former officer of Qualcomm, Inc. ("Qualcomm"), and his financial advisor Gary Yin concerning the securities of Qualcomm and Atheros Communications Incorporated ("Atheros").

2.     Through his position at Qualcomm, Wang acquired material nonpublic information about Qualcomm's financial results and performance as well as its plans to acquire Atheros. Wang then purchased stock in both companies on the basis of the nonpublic information, and sold the stock at a profit after the disclosure of the nonpublic information.

1

3.     Like Wang, Yin purchased stock in both companies on the basis of nonpublic information. Yin misappropriated information from Wang to purchase Qualcomm stock, and purchased Atheros stock based on a tip he received from Wang. In both instances, Yin's trading violated his employer's policies. Yin also sold his stock in both companies at a profit after the disclosure of the nonpublic information.

4.     To further this scheme, both Wang and Yin used sham brokerage accounts for their trading. The pair each set up offshore entities in the names of family members to disguise their actual ownership and control of the accounts. This allowed Wang and Yin to conceal their purchases and sales in Qualcomm and Atheros and to avoid paying capital gains tax.

5.     Worried that his illegal trading would eventually be detected, Wang convinced Yin to lie about Wang's Atheros trades by falsely attributing those trades to Wang's brother, who lived in China. Wang also attempted to distance himself from the trades by moving his profits into a new account. Yin assisted the cover up by using his firm's computer system to disassociate the sham brokerage account from Wang's other accounts.

6.     By knowingly trading on the basis of material nonpublic information, Wang made at least $244,199.66 and Yin made at least $27,444.02 from their insider trading scheme.

7.     By engaging in this conduct, Defendants Wang and Yin violated Section 10(b) of the Securities Exchange Act of 1934 ("Exchange Act") and Rule 10b-5 thereunder. Wang also violated Section 16(a) of the Exchange Act and Rule 16a-3 thereunder by failing to report his beneficial ownership of Qualcomm stock. The SEC seeks permanent injunctions prohibiting future violations, disgorgement of ill-gotten gains together with prejudgment interest, and civil penalties. The SEC also seeks an order barring Wang from serving as an officer or director of any public company.

## JURISDICTION AND VENUE

8.     This Court has jurisdiction over this action pursuant to Sections 21(e), 21A

and 27 of the Exchange Act, 15 U.S.C. §§ 78u(e), 78u-1 and 78aa.  In connection with the conduct described in this complaint, Defendants, directly or indirectly, made use of the means or instrumentalities of interstate commerce, of the mails, or of the facilities of a national securities exchange.

9.    Venue is proper in this district pursuant to Section 27 of the Exchange Act, 15 U.S.C. § 78aa, because certain of the transactions, acts, practices and courses of conduct constituting violations of the federal securities laws occurred within this district. Venue is also proper in this district because Defendants reside in this district.

## DEFENDANTS

10.    **Jing Wang**, age 51, resides in Del Mar, California.  Wang is the former executive vice president and president of Global Business Operations for Qualcomm.  He was designated an officer of Qualcomm pursuant to Section 16 of the Exchange Act on January 11, 2008.  Wang resigned from Qualcomm on May 1, 2013 after having been on administrative leave beginning on May 19, 2012.

11.    **Gary Yin**, age 54, resides in San Diego, California.  Yin is a former senior vice president, International Wealth Management Advisor at the San Diego branch office of Merrill Lynch. From July 1994 through April 15, 2013, Yin was a registered representative with Merrill Lynch, a broker-dealer registered with the SEC.  From approximately December 2008 to April 2013, Yin was associated with Merrill Lynch, an investment adviser registered with the SEC.

## RELEVANT ENTITIES

12.    **Qualcomm** is a Delaware corporation headquartered in San Diego, California.  Qualcomm's common stock trades on the Nasdaq Global Select Market under the symbol "QCOM" and is registered with the SEC pursuant to Section 12(b) of the Exchange Act.

13.    **Atheros** was a Delaware corporation headquartered in San Jose, California until it was acquired by Qualcomm in an acquisition that was announced on January 5, 2011.  Atheros's common stock was traded on the Nasdaq Global Select market under the

symbol "ATHR" and was registered with the SEC pursuant to Section 12(b) of the Exchange Act.

## STATEMENT OF FACTS

### A.    Defendants Wang and Yin

14.    Since 2005, Wang and Yin have been friends and members of the same church.  When Wang learned that Yin was a financial advisor at Merrill Lynch, Wang asked Yin to manage his money.

15.    In October 2005, Wang opened a number of brokerage accounts with Merrill Lynch's San Diego branch office.  He transferred all of the assets from a brokerage account he held at another firm into one of the newly established Merrill Lynch accounts.  Each of these accounts were disclosed to Qualcomm and managed by Yin.

### B.    Wang and Yin Engaged in an Insider Trading Scheme

#### 1.    Wang and Yin establish sham accounts to hide stock trading

16.    In early 2006, Wang approached Yin about hiding cash transactions.  Yin suggested that Wang create an entity registered in the British Virgin Islands ("BVI"), use the name of a non-U.S. citizen family member as the beneficial owner of the entity and open a brokerage account in the newly created entity's name.  Yin advised Wang that doing so would not only hide the transactions, but would also help Wang avoid paying capital gains taxes on assets in this account.

17.    In late March or early April 2006, Yin helped Wang set up a secret account in the name of a BVI company called "Unicorn Global Enterprises Ltd" (the "Unicorn account").  Wang listed his older brother, who lives in China, as the sole director, shareholder and registered owner of Unicorn.

18.    Wang owned and controlled the purchases and sales in the Unicorn account.  Wang originally funded the Unicorn account with a $360,000 transfer from a personal account that he held at E-Trade.  The Unicorn account was linked to Wang in Merrill Lynch's internal computer systems.  Yin, the financial advisor for the account,

4

knew that the money in the Unicorn account belonged to Wang.  Wang never disclosed the existence of the Unicorn account to Qualcomm.

19.    Moreover, Wang authorized transfers of money out of the Unicorn account and directed any changes that were made to the account.  For example, on November 19, 2010, Wang requested that Merrill Lynch change the account address from his residence in China, a hotel room at the St. Regis Hotel in Beijing, to the address for Unicorn's registered agent in the BVI.

20.    Yin similarly created his own entity registered in the BVI named "Pacific Rim," which was held in his mother-in-law's name.  Yin opened a brokerage account at Merrill Lynch for Pacific Rim (the "Pacific Rim account").  Yin owned and controlled the purchases and sales in the Pacific Rim account.  Yin used the Pacific Rim account to hide funds he was using for investments and to hold stocks so that Yin could avoid paying capital gains taxes.

**2.    Qualcomm's insider trading policies**

21.    As an employee of Qualcomm, Wang was subject to the company's insider trading policy, which prohibited trading if an employee became aware of material nonpublic information.  This policy specifically identified "material" information to include information related to (1) "[f]inancial performance, especially quarterly and year-end earnings, and significant changes in financial performance . . .," (2) "[p]otential acquisitions," and (3) "changes in Qualcomm dividend policies or amounts."

22.    Moreover, as an officer of Qualcomm, Wang was restricted in his ability to trade Qualcomm stock.  He was required to obtain preclearance from Qualcomm of all his Qualcomm trades.  Qualcomm's insider trading policy also prohibited its officers, directors and employees "who in the course of working for Qualcomm, learn[] of material nonpublic information of another company with which Qualcomm does business . . . [from trading] in that company's securities until that information becomes public or is no longer material."

23.    As early as January 2008, Yin became aware that Wang was an officer at

Qualcomm.  Yin knew that, as a Qualcomm officer, Wang was (1) restricted from purchasing or selling Qualcomm stock during certain periods of the year, known as closed trading windows, (2) needed preclearance from the company before executing any trades in Qualcomm stock and (3) was required to file reports with the SEC regarding changes in his beneficial ownership of Qualcomm stock.

24.    After January 2008, Yin coordinated with Qualcomm's stock administration group on Wang's legitimate Qualcomm trades to ensure the trades were precleared and to assist with Wang's SEC reporting requirements.  However, Yin never coordinated with Qualcomm's stock administration group or assisted with Wang's SEC reporting requirements in connection with Wang's Qualcomm trades made in the secret Unicorn account.

### 3.    Wang's and Yin's March 1, 2010 purchases of Qualcomm stock

25.    As early as February 24, 2010, Wang was aware that Qualcomm executives were planning a board proposal to increase Qualcomm's quarterly dividends and to request authority to initiate a stock repurchase program.  On that day, Wang received an email attaching briefing materials for the March 1, 2010 board of directors' meeting that included a presentation on "Dividend and Stock Repurchase Returning Capital to Shareholder."  Specifically, this presentation recommended raising Qualcomm's regular $0.17 quarterly dividend to $0.19, and recommended a new $3.0 billion stock repurchase.

26.    On February 26, 2010, Qualcomm sent an email to its executives, including Wang, informing them that the trading window was closed effective 1:00 p.m. (PST) on February 26, 2010.

27.    On March 1, 2010, Wang attended Qualcomm's board meeting, which started at 7:30 a.m. (PST).  During that meeting Qualcomm's board resolved (1) "that the quarterly dividend [would be] increased from $0.17 to $0.19 per share for dividends paid after March 28, 2010," a 12% increase; and (2) "that the Company is hereby authorized to purchase up to $3.0 billion of its shares of common stock" in a new stock repurchase program.

28.     Wang traded in Qualcomm stock on the basis of this material nonpublic information regarding the pending announcement of Qualcomm's dividend increase and share repurchase.  On March 1, 2010, Wang instructed Yin to use all the funds in the Unicorn account to purchase Qualcomm stock.  Wang called Yin at approximately 10:07 a.m. (PST) on March 1, 2010.  Ten minutes later, at approximately 10:17 a.m. (PST), Yin executed Wang's purchase of 7,700 shares of Qualcomm stock, for a total of $277,739, in the Unicorn account.

29.     The Qualcomm trading window was closed on March 1, 2010.  Wang did not preclear these purchases with Qualcomm or file a Form 4 with the SEC.

30.     Yin knew that Wang did not preclear or file a Form 4 for these purchases.  Yin also knew that the Qualcomm purchase was out of character for Wang because Wang had never previously purchased Qualcomm stock on the open market in his Merrill Lynch accounts.

31.     Yin traded in Qualcomm stock on the basis of material nonpublic information regarding Wang's secret trading in Qualcomm stock and, upon information and belief, the pending announcement of Qualcomm's dividend increase and share repurchase.  Between 10:41 a.m. (PST) and 11:25 a.m. (PST) on March 1, 2010, Yin purchased for himself 1,100 shares of Qualcomm stock, for a total of $39,523, in his Pacific Rim account.  During that same period, Yin purchased an additional 180 shares for a total of $6,461.98 in a trust account held by him and his wife.

32.     Later that day, after Wang's and Yin's trades were executed, Qualcomm made a series of announcements, including a press release issued at 1:30 p.m. (PST), announcing the quarterly cash dividend and stock repurchase program.  As a result of this announcement, Qualcomm's stock increased 6.7%, from the March 1 closing price of $35.56 per share to the March 2 closing price of $37.93 per share.

33.     On December 2, 2010, Wang's 7,700 shares of Qualcomm stock in his Unicorn account were sold at his instruction for a total of $372,448.23.  Wang did not file a Form 4 with the SEC for these sales.

34.     Yin sold all of his Qualcomm stock from his illegal trades on March 30, 2010, November 4, 2010, and February 18, 2011 for a total of $63,549.00.

**4.      Wang's and Yin's December 2010 purchases of Atheros stock**

35.     After selling all of the Qualcomm stock held in the Unicorn account on December 2, 2010, Wang used the funds from that sale to purchase shares of Atheros in advance of a planned acquisition by Qualcomm.

36.     On or about September 29, 2010, Wang received a copy of the briefing materials for Qualcomm's October 4, 2010 board of directors' meeting.  These materials included a September 2010 PowerPoint presentation that provided reasons why Qualcomm should acquire Atheros.  Wang also attended the October 4, 2010 board of directors' meeting during which the board received a briefing on the potential acquisition of Atheros.

37.     Qualcomm's planned acquisition of Atheros was a highly confidential project.  Qualcomm referred to the acquisition internally as "Project Tango" to protect the confidentiality of the transaction.

38.     Wang traded in Atheros stock on the basis of this material nonpublic information regarding the Atheros acquisition.  Around December 1 or 2, 2010, when Wang instructed Yin to sell all of Wang's Qualcomm stock in the Unicorn account, he also told Yin to prepare to buy as many shares of Atheros stock as possible with the funds in the Unicorn account.  Wang also told Yin that he was leaving on a trip to China and would contact Yin to give final approval on executing the Atheros trade.

39.     On December 6, 2010, Wang attended a Qualcomm board meeting in Hong Kong at which a resolution was passed to pursue the acquisition.  The Atheros discussion occurred on December 6, 2010 between 12:45 p.m. and 2:00 p.m., local Hong Kong time, which was between 8:45 p.m. and 10:00 p.m. (PST) on December 5, 2010.  By attending the board meeting, Wang obtained material nonpublic information that Qualcomm planned to acquire Atheros at $45 per share.

40.     Due to the time difference, the December 6 board meeting ended in Hong

8

Kong before the U.S. markets opened on December 6. Once the markets opened that day, Wang and Yin communicated several times. At 7:43 a.m. (PST), Wang called Yin for three minutes. Yin then sent a text message to Wang at 8:25 a.m. (PST) At 8:26 a.m. (PST), Yin called Wang for one minute. At 8:36 a.m. (PST), Wang then called Yin for two minutes.

41.     Moments after that last call, Wang purchased 10,800 Atheros shares in the Unicorn account, which was the maximum number of shares Wang could purchase with the funds in the account. Wang purchased 100 shares for $34.16 per share at 8:42 a.m. (PST). He then purchased 10,700 shares for $34.2782 per share at 8:53 a.m. (PST). Wang's purchases were at a price significantly below Qualcomm's planned offer of $45 per share for Atheros.

42.     Yin traded in Atheros stock on the basis of material nonpublic information regarding the Atheros acquisition that he received from Wang. On December 7, 2010, Yin purchased 1,000 shares of Atheros stock for $34.80 per share in his Pacific Rim account. Yin knew that Wang had a tip regarding Atheros and that Wang was encouraging him to buy Atheros stock. Yin knew, or was reckless in not knowing, the Atheros purchase was out of character for Wang because he knew that Wang had rarely purchased equity stocks on the open market and that Wang's investments were primarily in money market mutual funds. Yin had not previously purchased Atheros stock.

43.     On January 4, 2011 at 12:00 p.m. (PST), the New York Times Dealbook section posted an article "QCOM is Said to Be Set to Buy ATHR for $3.5 Billion." That day, Atheros shares closed at $44.00, an increase of $6.98, or 18.9% from the prior trading day's close. On January 5, at 5:15 a.m. (PST), Qualcomm announced that Qualcomm and Atheros had entered into a definitive agreement whereby Qualcomm intended to acquire Atheros for $45 per share in cash, representing an enterprise value of $3.1 billion. On January 5, Atheros shares closed up an additional $0.64 from the prior trading day's close. In total, after both public releases related to the acquisition, Atheros' shares closed at an increase of $7.62, or 20.6%, from the January 3, 2011 closing price.

44.     On January 12, 2011, Yin sold his 1,000 Atheros shares in the Pacific Rim account for $44.68 per share for a total of $44,680.

45.     On January 25, 2011, Wang's 10,800 Atheros shares in his Unicorn account were sold at his instruction at $44.60 per share for a total of $481,680.

**5.     Wang's January 25, 2011 purchase of Qualcomm stock**

46.     Four minutes after selling all of the Atheros stock in the Unicorn account, Wang used the proceeds of that sale to purchase shares of Qualcomm in advance of an announcement that Qualcomm would raise its revenue and earnings guidance for the fiscal year.

47.     As early as December 1, 2010, Wang was aware that Qualcomm expected to raise guidance for fiscal year 2011.  On December 1, 2010, Wang received an email attaching the briefing materials for the December 6, 2010 board of directors' meeting that included an updated first quarter 2011 and full fiscal year financial outlook.  The briefing materials also included a presentation that discussed meetings with Atheros executives on October 29, 2010 during which Qualcomm "provided strong guidance for 2011" that was "[w]ell above the street's new consensus numbers."  This information was further confirmed during the December 6, 2010 board meeting in Hong Kong, which included a discussion of Qualcomm's better than expected first quarter financial performance.  Wang also learned that Qualcomm planned to announce its earnings results on January 26, 2011.

48.     On December 6, 2010, Qualcomm sent an email to its executives, including Wang, informing them that the trading window was closed as of December 5, 2010.

49.     Wang traded in Qualcomm stock on the basis of material nonpublic information regarding Qualcomm's increased guidance.  On January 25, 2011 at 11:34 a.m. (PST), one day before Qualcomm was going to announce its revised earnings guidance, Wang called Yin for one minute.  At approximately 11:46 a.m. (PST) that same day, Wang sold all of his Atheros shares in the Unicorn account at $44.60 per share for $481,680.  Four minutes later, at approximately 11:50 a.m. (PST) on January 25, Wang

used the proceeds from this sale to purchase 9,450 shares of Qualcomm stock at $50.8799 per share for $480,815.06.

50.    The Qualcomm trading window was closed on January 25, 2011. Wang did not preclear these purchases with Qualcomm or file a Form 4 with the SEC.

51.    The following day at 1 p.m. (PST), Qualcomm issued a press release announcing record first quarter fiscal 2011 results, and the raising of revenue and earnings guidance for the fiscal year. As a result of this announcement, Qualcomm's stock increased 5.9% from a January 26 closing price of $51.86 per share to a January 27 closing price of $54.90 per share.

52.    On December 27, 2011, during a closed trading window, Wang's 9,450 shares of Qualcomm stock in his Unicorn account were sold at his instruction for $518,818.23. Wang did not file a Form 4 with the SEC for these sales.

**6.    Defendants' efforts to conceal their insider trading**

53.    Wang eventually realized that his illegal trading may be detected by Merrill Lynch or others. He then executed a plan to conceal his trading activity. At first, Wang asked Yin to delete records related to these trades in the Unicorn account. Because the trading records were permanent records in Merrill Lynch's systems they could not be deleted. Wang then told Yin he would think some more about it and contact Yin with instructions on how to proceed.

54.    In or about January 2012, Wang directed Yin to establish a new BVI corporation under the name "Clearview Resources, Ltd." (the "Clearview Resources account") and to open a new account at Merrill Lynch for the entity. The insider trading proceeds in the Unicorn account were then transferred to the Clearview Resources account in an effort to further distance Wang from the Unicorn trades.

55.    Later, in or about April 2012, Wang informed Yin that the trades may be detected by the SEC or others because the SEC had subpoenaed Wang's emails. Wang was concerned that his control of the Unicorn account and his insider trading would be discovered. At this time, Wang concocted a cover story for the Atheros trades, which he

11

conveyed to Yin.  Specifically, Wang convinced Yin to say that the Atheros trades were made by Wang's brother, Bing Wang, who was also known as Bin Wang.  Because Yin had never communicated with Bing Wang, Wang instructed Yin to travel to China with the Unicorn account statements and review the trades with Bing Wang so that Bing Wang could explain the trading if asked.  Yin did so in May 2012.

56.    To further hide Wang's ownership of the Unicorn account and his link to the trades in Atheros, on July 5, 2012, Yin removed the Unicorn account from Wang's "household" in Merrill Lynch's computer system.  "Householding" is a function used by Merrill Lynch to link related accounts.

## C.    Materiality of Nonpublic Information Related to Qualcomm and Atheros

57.    The information used by Wang and Yin to trade in Qualcomm and Atheros stock was material and nonpublic.

58.    The March 1, 2010 information that Qualcomm's board of directors passed a resolution to increase its quarterly dividend and start a new $3.0 billion stock repurchase program was material.  Qualcomm's stock price rose 6.7% after the news was made public.  Further, as to Yin, the nonpublic information that Wang, a Qualcomm officer, was purchasing Qualcomm stock in a secret account, without preclearance, was also material.

59.    Information that Qualcomm's board of directors passed a resolution to acquire Atheros was material.  Atheros' stock price rose 20.6% after the New York Times Dealbook section and Qualcomm publicly announced the acquisition on January 4 and 5, 2011 respectively.

60.    As to Yin, the nonpublic information that Wang intended to use of all of the proceeds of his first Qualcomm sale in the secret Unicorn account to purchase Atheros stock was also material.  Yin knew that Wang had tipped him regarding Atheros.  Yin also knew that Wang's Atheros purchase was out of character for Wang because he had rarely purchased equity stocks on the open market.

61.    Likewise, nonpublic information regarding Qualcomm's planned January

26, 2011 announcement of record earnings in the first quarter and substantially raising guidance for the fiscal year was material.  Qualcomm's stock price rose 5.9% after Qualcomm made the public announcement of this information.

**D.    Wang's Breach of Fiduciary Duty to Qualcomm and Atheros**

62.    As a Qualcomm officer, Wang owed a fiduciary duty to the shareholders of the company, as well as a duty of trust or confidence to Qualcomm.  Wang acknowledged in writing his awareness of the company's insider trading policy, which specifically prohibited trading in Qualcomm securities while in possession of material nonpublic information and tipping or disclosing material nonpublic information to outsiders.  Moreover, when a Qualcomm officer possesses material nonpublic information about a company that Qualcomm does business with, the insider trading policy prohibits the officer from trading in the securities of that other company.

63.    Wang breached these duties when he traded in (1) Qualcomm stock on March 1, 2010 prior to the company's announcement regarding increased dividends and a new $3.0 billion stock repurchase program; (2) Atheros stock on December 6, 2010 prior to the announcement that Qualcomm was acquiring Atheros and (3) Qualcomm stock on January 25, 2011 before Qualcomm publicly announced its record quarterly results and raised guidance for the fiscal year.

64.    Wang further breached his duty of trust or confidence to Qualcomm when he tipped Yin about purchasing Atheros stock prior to Qualcomm's public announcement of the Atheros acquisition.  By tipping Yin to purchase Atheros stock, Wang provided a gift of confidential information to Yin, his friend and financial advisor, who then traded on that information.

65.    In addition, Wang was a temporary insider of Atheros.  Atheros shared confidential information with Qualcomm in connection with the proposed, and ultimately completed, acquisition.   Wang became aware of this material nonpublic information concerning Atheros through his employment with Qualcomm.  As a result, Wang owed a duty to Atheros and its shareholders not to trade on its material nonpublic information.

Wang breached that duty when he traded in Atheros stock on December 6, 2010 and when he tipped Yin.

**E.    Yin Breached a Duty of Trust and Confidence He Owed to Wang and Merrill Lynch**

66.    As Wang's financial advisor and friend, Yin owed Wang a duty of trust and confidence.

67.    Yin purchased Qualcomm stock on March 1, 2010 based on material nonpublic information he misappropriated from Wang. This misappropriation breached the duty of trust or confidence he owed Wang.

68.    Yin's trading in Atheros and Qualcomm also violated Merrill Lynch's policies in place at the time of Yin's trades. These policies, among other things, (1) require Merrill Lynch employees to keep information about a client's orders confidential, (2) bar employees from using client orders in any way to trade in employee accounts, and (3) prohibit employees from taking advantage of client trades by, among other things, "piggybacking," or patterning, an employee's trades after a client's trading.

69.    Yin's misappropriation of information regarding Wang's trades breached a duty of trust or confidence that Yin owed to Merrill Lynch.

**F.    Defendants' Scienter**

70.    Wang acted with scienter by trading in the securities of Qualcomm and Atheros while in possession of material nonpublic information he obtained through his employment with Qualcomm.

71.    Because he was an officer of Qualcomm and acknowledged receiving the company's insider trading policies, Wang knew, or was reckless in not knowing, the federal securities laws concerning insider trading.

72.    Wang knew, or was reckless in not knowing, that if he obtained material nonpublic information through his employment with Qualcomm, he should maintain the information in confidence and not use it for his own personal benefit.

73.    Wang knew, or was reckless in not knowing, that he was prohibited from

trading on material nonpublic information concerning Qualcomm's acquisitions or financial results.

74.    Wang knew, or was reckless in not knowing, that, because he was in possession of material nonpublic information about Atheros, he was prohibited from trading in Atheros stock.

75.    Yin knew, or was reckless in not knowing, that due to Wang's position at Qualcomm, Wang had access to material nonpublic information about Qualcomm.

76.    Yin acted with scienter by trading in the securities of Qualcomm while he was aware of material nonpublic information that he misappropriated from Wang.

77.    Yin knew, or should have known, that Wang's tip concerning Atheros was conveyed in breach of Wang's fiduciary duties.

78.    Yin knew, or was reckless in not knowing, that if he received confidential information from Wang, Yin should maintain the information in confidence and not use it for his own personal benefit.

79.    Yin acted with scienter by trading in the securities of Atheros while he was aware of material nonpublic information obtained from Wang.

80.    Yin knew, or was reckless in not knowing, that the information he obtained about Qualcomm and Atheros was material and nonpublic.

81.    Moreover, at the time Yin purchased Qualcomm and Atheros stock, he also knew, or was reckless in not knowing, that the confidential information he possessed about Wang's trading was material and nonpublic.  Yin knew, or was reckless in not knowing, that trading on the basis of such misappropriated information was in violation of the duties he owed to his employer, Merrill Lynch.

**G.    Wang's Failure to Report His Beneficial Ownership of Qualcomm**

82.    As of January 2008, Wang was required to file Forms 4 with the SEC to disclose the changes in his beneficial ownership of Qualcomm stock because he was designated a Section 16 officer of the company.

83.    Wang failed to file Forms 4 for the following trades he made in Qualcomm

stock through his Unicorn account:  (1) March 1, 2010 purchase of 7,700 shares of Qualcomm stock; (2) December 2, 2010 sale of 7,700 shares of Qualcomm stock; (3) January 25, 2011 purchase of 9,450 shares of Qualcomm stock; and (4) December 27, 2011 sale of 9,450 shares of Qualcomm stock.

## FIRST CLAIM FOR RELIEF

### (Against All Defendants)

### Fraud in Connection with the Sale of Securities

### Violations Of Section 10(b) Of The Exchange Act and Rule 10b-5

84.    The SEC realleges and incorporates by reference paragraphs 1 through 83 above.

85.    Wang and Yin, by engaging in the conduct described above, directly or indirectly, in connection with the purchase or sale of a security, by the use of means or instrumentalities of interstate commerce, of the mails, or of the facilities of a national securities exchange, with scienter:

(a)    employed devices, schemes, or artifices to defraud;

(b)    made untrue statements of a material fact or omitted to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading; or

(c)    engaged in acts, practices, or courses of business which operated or would operate as a fraud or deceit upon other persons.

86.    By engaging in the conduct described above, Wang and Yin, violated, and unless restrained and enjoined will continue to violate, Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 thereunder 17 C.F.R. § 240.10b-5.

## SECOND CLAIM FOR RELIEF

### (Against Wang)

### Failure to Report Beneficial Ownership of Public Securities

### Violations of Section 16(a) of the Exchange Act and Rule 16a-3 thereunder

87.    The SEC realleges and incorporates by reference paragraphs 1 through 83

above.

88.  Defendant Wang, by engaging in the conduct described above, and as an officer of Qualcomm, failed to file with the SEC required statements of, or changes to, his beneficial ownership of Qualcomm stock on Forms 4.

89.  By engaging in the conduct described above, Wang, violated, and unless restrained and enjoined, will continue to violate, Section 16(a) of the Exchange Act, 15 U.S.C. § 78p(a), and Rule 16a-3 thereunder, 17 C.F.R. § 240.16a-3.

### **PRAYER FOR RELIEF**

WHEREFORE, the SEC respectfully requests that the Court:

### **I.**

Issue findings of fact and conclusions of law that Wang and Yin committed the alleged violations.

### **II.**

Issue a judgment, in a form consistent with Rule 65(d) of the Federal Rules of Civil Procedure, permanently enjoining Defendant Wang and his agents, servants, employees, and attorneys, and those persons in active concert or participation with him, who receive actual notice of the judgment by personal service or otherwise, and each of them, from violating Sections 10(b) and 16(a) of the Exchange Act, 15 U.S.C. §§ 78j(b) and 78p(a), and Rules 10b-5 and 16a-3 thereunder, 17 C.F.R. §§ 240.10b-5 and 240.16a-3.

### **III.**

Issue a judgment, in a form consistent with Rule 65(d) of the Federal Rules of Civil Procedure, permanently enjoining Defendant Yin and his agents, servants, employees, and attorneys, and those persons in active concert or participation with him, who receive actual notice of the judgment by personal service or otherwise, and each of them, from violating Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 thereunder, 17 C.F.R. § 240.10b-5.

**IV.**

Order Defendants Wang and Yin to disgorge the illegal trading profits described herein, together with prejudgment interest thereon.

**V.**

Order Defendants Wang and Yin to pay civil penalties under Sections 21(d)(3) and 21A(a)(2) of the Exchange Act, 15 U.S.C. §§ 78u(d)(3) and 78u-1(a)(2).

**VI.**

Prohibit Defendant Wang from acting as an officer or director of any public company pursuant to Section 21(d)(2) of the Exchange Act, 15 U.S.C. § 78u(d)(2).

**VII.**

Retain jurisdiction of this action in accordance with the principles of equity and the Federal Rules of Civil Procedure in order to implement and carry out the terms of all orders and decrees that may be entered, or to entertain any suitable application or motion for additional relief within the jurisdiction of this Court.

**VIII.**

Grant such other and further relief as this Court may determine to be just and necessary.


Dated:  September 23, 2013                    Respectfully submitted,


                                              /s/ Sam S. Puathasnanon
                                              Sam S. Puathasnanon
                                              Ann C. Kim
                                              Wendy Pearson
                                              Attorneys for Plaintiff
                                              Securities and Exchange Commission